**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BONNIE MAAS, Derivatively on Behalf of EVOLV TECHNOLOGIES HOLDINGS, INC. F/K/A NEWHOLD INVESTMENT CORP., | Case No.: |
| Plaintiff, | |
| v. | |
| NEIL GLAT, KEVIN CHARLTON, MICHAEL ELLENBOGEN, DAVID MOUNTS GONZALES, RAJAN NAIK, MERLINE SAINTIL, KIMBERLY SHEEHY, MARK SULLIVAN, BILAL ZUBERI, JOHN KEDZIERSKI, ALAN COHEN, PETER GEORGE, MARIO RAMOS, MARK DONOHUE, and DAVID ORFAO, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| EVOLV TECHNOLOGIES HOLDINGS, INC. F/K/A NEWHOLD INVESTMENT CORP., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Bonnie Maas ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant Evolv Technologies Holdings, Inc. f/k/a NewHold Investment Corp. ("Evolv" or the "Company"), brings this Verified Shareholder Derivative Complaint against Neil Glat ("Glat"), Kevin Charlton ("Charlton"), Michael Ellenbogen ("Ellenbogen"), David Mounts Gonzales ("Gonzales"), Rajan Naik ("Naik"), Merline Saintil ("Saintil"), Kimberly Sheehy ("Sheehy"), Mark Sullivan ("Sullivan"), Bilal Zuberi ("Zuberi"), John Kedzierski ("Kedzierski"), Alan Cohen ("Cohen"), Peter George ("George"), Mario Ramos ("Ramos"), Mark Donohue ("Donohue"), and David Orfao ("Orfao") (collectively, the "Individual Defendants" and, together with Evolv, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Evolv with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought against certain current and former Evolv officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between June 28, 2021 and October 30, 2024, inclusive (the "Relevant Period").

2.    Evolv is a security technology company that provides artificial intelligence (AI)-based weapons detection for security screening in the United States and internationally. Its

products include Evolv Express, a touchless security screening system designed to detect firearms, improvised explosive devices, and tactical knives; and Evolv Insights, which provides self-serve access, insights regarding visitor flow and arrival curves, location specific performance, system detection performance, and alarm statistics.

3.    Throughout the Relevant Period, the Individual Defendants caused the Company to issue false and misleading statements that overstated the efficacy of Evolv's flagship security screening product, Evolv Express.

4.    The truth began to emerge on November 2, 2022, when Internet Protocol Video Market ("IPVM"), a security and surveillance industry research group, published a report (the "IPVM Report") that questioned the validity of an earlier report published by The National Center for Spectator Sports Safety and Security (the "NCS4") that touted the efficacy of Evolv's technology (the "NCS4 Report"). The IPVM Report exposed the fact that Evolv had seemingly reviewed and edited the NCS4 Report before it was published, going as far as to remove findings that demonstrated that Evolv's technology struggled to detect certain types of knives, as well as bombs.

5.    Also on November 2, 2022, the BBC released an article titled "Manchester Arena's weapon scanning tech questioned" (the "November 2022 BBC Article") that cited to IPVM's findings and similarly exposed the NCS4 Report as having been manipulated by Evolv employees. On this news, the price of Evolv stock fell by $0.08, or 2.73% to close at $2.85 on November 2, 2022. The next day, November 3, 2022, it fell a further $0.16, or 5.6%, to close at $2.69.

6.    Then, on May 23, 2023, BBC News published an article titled "AI scanner used in hundreds of US schools misses knives" (the "May 2023 BBC Article"). The May 2023 BBC Article described an incident that had taken place in Utica, New York, in which a student had

stabbed another student at school with a knife that had gone undetected through an Evolv weapons detection system. On this news, the price of Evolv stock fell by $0.45, or 7.56%, to close at $5.50 on May 23, 2023.

7.     On October 12, 2023, Evolv filed with the SEC a Current Report on Form 8-K, announcing that: "On October 12, 2023, the Company announced that the U.S. Federal Trade Commission had requested information about certain aspects of its marketing practices and we are pleased to answer their questions, as well as educate them about our mission to make communities safer and more secure." On this news, the price of Evolv stock fell $0.58 per share, or 13.33%, to close at $3.77 on October 12, 2023.

8.     On October 25, 2023, IPVM released an article entitled "Why We Believe Evolv Express Is Not Actually Intelligent" that detailed multiple technological problems with Evolv's products, including the fact that Evolv's weapons detectors "rely on simplistic sensitivity tuning . . . rather than actual intelligence." On this news, the price of Evolv stock fell $0.06, or 1.48%, to close at $3.99 on October 25, 2023.

9.     Then, on February 20, 2024, Evolv issued a press release announcing that "the SEC notified the Company it was initiating an investigation that was described as a confidential "non-public, fact finding inquiry." On this news, the price of Evolv stock fell by $0.82 per share, or 15.67%, to close at $4.41 on February 20, 2024.

10.     On March 13, 2024, the BBC released an article titled "AI weapons scanner backtracks on UK testing claims" (the "March 2024 BBC Article"). The March 2024 BBC Article explained that, although Evolv had claimed in a press release that the UK Government's National Protective Security Authority (the "NPSA") had "concluded that the Evolv Express solution was highly effective at detecting firearms and many other types of weapons," in reality, the NPSA does

not perform that type of testing. The March 2024 BBC Article then explained how the BBC had contacted Evolv to inquire about this discrepancy and how, in response, Evolv had updated the press release to indicate that an independent company, rather than the NPSA, had "tested and validated" the technology using NPSA's standards. According to the article, the BBC then asked the independent company that had done the testing for comment, and that company, Metrix NDT, told the BBC that it was "not correct to say we 'validated' the system." On this news, the price of Evolv stock fell by $0.13 per share, or 3.51%, to close at $3.57 on March 13, 2024.

11.    In addition to the foregoing misleading statements regarding Evolv Express, during the relevant period, the Individual Defendants caused the Company to issue a series of material misstatements relating to Evolv's revenue recognition and other related metrics.

12.    The truth regarding the Company's financial misstatements was revealed on October 25, 2024, when the Company announced that its financial statements issued between the second quarter of 2022 and the second quarter of 2024 should not be relied upon. The Company revealed that "certain sales, including sales to one of its largest channel partners, were subject to extra-contractual terms and conditions" and were not shared with the Company's accounting personnel "and that certain Company personnel engaged in misconduct in connection with those transactions." The Company also announced that it "expects to report one or more additional material weaknesses in internal control over financial reporting," was delaying filing its upcoming quarterly report for the third quarter of 2024, and that it has "self-reported these issues" to the SEC.

13.    On this news, the price of Evolv stock declined almost 40%, from $4.10 per share on October 24, 2024, to $2.47 per share on October 25, 2024, on unusually high trading volume.

14.    Then, on October 31, 2024, Evolv announced that it had terminated the Company's Chief Executive Officer ("CEO"), Defendant George, effective immediately.

15.     On this news, the price of Evolv stock declined over 8%, from $2.34 per share on October 30, 2024, to $2.15 per share on October 31, 2024, on unusually high trading volume.

16.     In light of the Individual Defendants' misconduct, the Company as well as certain of the Individual Defendants were named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the District of Massachusetts. The first, captioned *Raby v. Evolv Tech. Holdings, Inc. f/k/a NewHold Investment Corp., et al.,* Case No. 1:24-cv-10761-ADB (D. Mass.) (the "First Securities Class Action") named the Company and Defendants George, Ramos, Donohue, and Charlton as defendants. The second, captioned *Buchan v. Evolv Tech. Holdings, Inc., et al.,* Case No. 1:24-cv-12768-RGS, named Defendants George and Donohue as defendants, in addition to the Company. These lawsuits are collectively referred to herein as the "Securities Class Actions." The Securities Class Actions have further subjected Evolv to the need to undertake internal investigations and the need to implement adequate internal controls, as well as exposed the Company to massive class-wide liability.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims asserted herein raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n-1) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Evolv's principal executive offices are located in this district, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

**PARTIES**

22.     Plaintiff is a current shareholder of Evolv and has continuously held Evolv common stock at all relevant times.

23.      Nominal Defendant Evolv is incorporated under the laws of Delaware, and its principal executive offices are located at 500 Totten Pond Road, 4th Floor, Waltham, MA 02451. The Company's common stock trades on the Nasdaq under the symbol "EVLV." Prior to its merger with Evolv Inc. ("Legacy Evolv"), a special purpose acquisition company ("SPAC"), the Company was known as NewHold Investment Corp. ("NewHold").

24.     Defendant Glat has served as a Company director since July 2021 and as Chairman of the Board since November 2023. Defendant Glat is a member of the Board's Nominating and Corporate Governance Committee and the Investment Committee. According to the proxy statement filed on Schedule 14A with the SEC on April 15, 2024 (the "2024 Proxy Statement"), in 2023, Defendant Glat received $205,899 in total compensation.

25.     Defendant Charlton has served as a Company director since July 2021. Defendant Charlton is the Chair of the Board's Compensation Committee and the Investment Committee, and serves as a member of the Technology Committee. According to the 2024 Proxy Statement, in

2023, Defendant Charlton received $185,705 in total compensation. Defendant Charlton was named as a defendant in the First Securities Class Action.

26.    Defendant Ellenbogen has served as a Company director and as the Company's Chief Innovation Officer since July 2021. On October 30, 2024, Defendant Ellenbogen was appointed as the Company's Interim President and CEO. Defendant Ellenbogen is the Chair of the Board's Technology Committee. According to the 2024 Proxy Statement, as of April 2, 2024, Defendant Ellenbogen beneficially owned 6,876,146 shares of Evolv class A common stock, worth approximately $34,724,537.30.[1]

27.    Defendant Gonzales has served as a Company director since November 2023. Defendant Gonzales is a member of the Board's Audit Committee. According to the 2024 Proxy Statement, in 2023, Defendant Gonzales received $100,750 in total compensation.

28.    Defendant Naik has served as a Company director since November 2023.

29.    Defendant Saintil has served as a Company director since July 2021. Defendant Saintil is the Chair of the Board's Nominating and Corporate Governance Committee and serves as a member of the Audit Committee. According to the 2024 Proxy Statement, in 2023, Defendant Saintil received $201,746 in total compensation.

30.    Defendant Sheehy has served as a Company director since July 2021. Defendant Sheehy is the Chair of the Board's Audit Committee and serves as a member of the Compensation Committee and the Investment Committee. According to the 2024 Proxy Statement, in 2023, Defendant Sheehy received $211,399 in total compensation.

---

[1] The share price of Evolv's class A common stock closed at $5.05 on April 2, 2024.

31.    Defendant Sullivan has served as a Company director since July 2021. Defendant Sullivan is a member of the Board's Compensation Committee. According to the 2024 Proxy Statement, in 2023, Defendant Sullivan received $214,993 in total compensation.

32.    Defendant Zuberi has served as a Company director since July 2021. Defendant Zuberi is a member of the Board's Technology Committee. According to the 2024 Proxy Statement, in 2023, Defendant Zuberi received $184,996 in total compensation.

33.    Defendant Kedzierski served as a Company director from January 2022 until his resignation from the Board effective November 2, 2023.

34.    Defendant Cohen served as Chairman of the Board from July 2021 until his resignation from the Board effective November 2, 2023. According to the proxy statement filed on Schedule 14A on April 13, 2023 (the "2023 Proxy Statement"), as of April 4, 2023, Defendant Cohen beneficially owned 1,088,691 shares of Evolv class A common stock, worth approximately $3,211,638.45.[2]

35.    Defendant George served as the Company's President, CEO, and as a Company director from July 2021 until his termination by the Company on October 30, 2024. According to the 2024 Proxy Statement, in 2023, Defendant George received $4,827,787 in total compensation. Also according to the 2024 Proxy Statement, as of April 2, 2024, Defendant George beneficially owned 6,585,652 shares of Evolv class A common stock, worth approximately $33,257,542.60. Defendant George was named as a defendant in the Securities Class Actions.

36.    Defendant Ramos served as the Company's Chief Financial Officer ("CFO") and Chief Risk Officer from November 2021 through June 2022. According to the proxy statement filed on Schedule 14A with the SEC on April 13, 2022 (the "2022 Proxy Statement"), in 2021,

---

[2] The share price of Evolv's class A common stock closed at $2.95 on April 4, 2023.

Defendant Ramos received $4,466,153 in total compensation from the Company. Defendant Ramos was named as a defendant in the First Securities Class Action.

37.    Defendant Donohue has served as the Company's CFO since June 2022. According to the 2024 Proxy Statement, in 2023, Defendant Donohue received $2,867,531 in total compensation. Defendant Donohue was named as a defendant in the Securities Class Actions.

38.    Defendant Orfao served as a Company director from July 2021 until his resignation from the Board effective September 2, 2022.

39.    Defendants George, Glat, Charlton, Ellenbogen, Cohen, Sheehy, Sullivan, Saintil, Gonzales, Naik, Zuberi, Orfao, and Kedzierski are herein referred to collectively as the "Proxy Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

40.    By reason of their positions as officers, directors, and/or fiduciaries of Evolv and because of their ability to control the business and corporate affairs of Evolv, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

41.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business

prospects so that the market price of the Company's stock would be based on truthful and accurate information.

42.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

43.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all

times;

(d)      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)      ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

44.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## THE CODE OF BUSINESS CONDUCT AND ETHICS

45.      Evolv maintains a Code of Business Conduct and Ethics (the "Code") that states that it applies to the Company's "directors, officers and other employees." The Code further states that Evolv "conducts business ethically and honestly in full compliance with applicable laws and regulations" and goes on to explain that "[t]o the extent this Code requires a higher standard than

required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards."

46.     In a section titled "Company Records," the Code provides the following guidance regarding proper maintenance of the Company's records, in relevant part:

> Accurate and reliable records are crucial to our business.  Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning.  Company records include financial records, personnel records, records relating to our technology and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business. All Company records must be complete, accurate and reliable in all material respects.  Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control.

47.     In a section titled "Accuracy of Financial Reports and Other Public Communications," the Code provides the following:

> As a public company we are subject to various securities laws, regulations and reporting obligations.  Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations.  Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.
>
> The Company's principal financial officers and other employees working in the Finance Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable.  These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

48.     In a section titled "Compliance with Laws and Regulations," the Code states the following, in relevant part:

> Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations.  These include, without limitation, laws covering bribery and kickbacks, the development, testing, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust

13

prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's General Counsel.

*       *       *

E. Public Communications and Regulation FD

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Statement – Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material non-public information about the Company to securities market professionals or the Company's stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public.

## **THE AUDIT COMMITTEE CHARTER**

49.     The Company also maintains an Audit Committee Charter (the "Charter"), which states that the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

50.     In a section titled "Duties and Responsibilities," the Charter enumerates the Audit Committee's obligations to the Company:

*Annual Financial Statements and Annual Audit*

3. *Audit Problems.* The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4. *Form 10-K Review.*  The Committee must review and discuss with management and the independent auditor the annual audited financial statements and related disclosures included in each 10-K on Form 10-K to be filed by the Company, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" for inclusion in the Company's 10-K on Form 10-K.

5. *Audit Committee Report.*  The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

<u>Quarterly Financial Statements</u>

6.  *Form 10-Q Review.*  The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" for inclusion in the Company's Quarterly Report on Form 10-Q.

<u>Other Duties and Responsibilities</u>

7. *Review of Earnings Releases.*  The Committee must review and discuss the Company's planned public announcements regarding the Company's results of operations, including quarterly earnings releases and presentations, financial information and earnings guidance to be provided to investors, analysts and rating agencies, the use of non-GAAP financial measures and any proposed announcements that reflect a reflect a major shift in Company strategy or outlook.

8. *Risk Assessment and Risk Management.*  The Committee must oversee enterprise risk management, including the management of financial risks and cybersecurity risks; review and discuss the Company's guidelines and policies with respect to risk assessment and risk management; and discuss with management the steps management has taken to monitor and control these exposures.  The Committee will report to the Board periodically with respect to the foregoing matters.

*        *        *

10. *Compliance with Applicable Laws and Regulations.*  The Committee must review the Company's compliance with applicable laws and regulations and review and oversee the Company's policies, procedures and programs designed to promote and monitor legal, ethical and regulatory compliance.

*        *        *

13. *Review of Internal Control Over Financial Reporting.*  The Committee must review and discuss with management and the independent auditor the adequacy of

the Company's internal control over financial reporting ("ICFR"), the adequacy of the Company's disclosures about changes in ICFR and any steps management has taken to address material deficiencies in ICFR. The Committee must review and discuss with management and the independent auditor management's report on ICFR and the independent auditor's attestation report on the Company's ICFR for purposes of the Company's 10-K on Form 10-K, to the extent such reports are required.

## THE CORPORATE GOVERNANCE GUIDELINES

51.    The Board maintains "Corporate Governance Guidelines" (the "Guidelines") that "assist the Board in the exercise its responsibilities and to serve the interests of the Company and its stockholders."

52.    In a section titled "Director Responsibilities," the Guidelines provide the following list of the Board's obligations to the Company:

• exercising their business judgment in good faith;

• acting in what they reasonably believe to be the best interest of all stockholders;

• becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company;

• reviewing and, where appropriate, approving the Company's major financial objectives, plans and actions;

• reviewing and, where appropriate, approving major changes in, and determinations under, these Corporate Governance Guidelines, the Company's Code of Business Conduct and Ethics and other Board-approved policies of the Company;

• reviewing and, where appropriate, approving actions to be undertaken by the Company that would result in a material change in the financial structure or control of the Company, the acquisition or disposition of any businesses or asset(s) material to the Company or the entry of the Company into any major new line of business;

• overseeing management of the Company's risks, including, without limitation, oversight of disclosure controls and procedures;

• reviewing the performance of the Chief Executive Officer and other executive officers, considering any input from the Compensation Committee;

• planning for succession with respect to the position of Chief Executive Officer and monitoring management's succession planning for other key executives;

• setting a "tone at the top" that emphasizes compliance with the highest standards of ethical conduct and promotes the Company's mission, vision, values and culture;

and

• ensuring that the business of the Company is conducted so as to further the longterm interests of its stockholders.

53.    In a section titled "Risk Management," the Guidelines detail the following additional responsibilities of the Board in the context of risk management:

the Board and the Board committees shall have an active role in overseeing management of the Company's risks.  The Board shall regularly review information regarding the Company's credit, liquidity and operations, as well as the risks associated with each.   The Company's Compensation Committee shall be responsible for overseeing the management of risks relating to the Company's incentive compensation and equity-based plans and arrangements.  The Company's Audit Committee shall oversee management of financial and cybersecurity risks. The Nominating and Corporate Governance Committee shall manage risks associated with the independence of the Board and potential conflicts of interest as well as oversee the Company's efforts with regard to environmental, social and governance matters and associated risks.   While each committee shall be responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks.

## SUBSTANTIVE ALLEGATIONS

### A.  The Individual Defendants Cause Evolv to Issue False and Misleading Statements regarding the Company's Security Screening System

54.    On June 28, 2021, NewHold filed with the SEC its definitive proxy on SEC Form 424B3 (the "Proxy") to solicit votes for its July 15, 2021 Special Meeting to approve the SPAC merger with the then-private Legacy Evolv.

55.    The Proxy contained the following statement touting the Company's security screening technology:

Evolv Technologies, Inc. [. . .] is the global leader in AI-based touchless security screening. ***Unlike conventional walk-through metal detectors, our products use advanced sensors, artificial intelligence software, and cloud services to reliably detect guns, improvised explosives, and large knives while ignoring harmless items like phones and keys***.[3] This not only enhances security at venues and

---

[3] All emphasis added, unless otherwise noted.

facilities but also improves the visitor experience by making screening up to ten times faster than alternatives at up to 70% lower total cost.

56.    The Proxy then provided the following description of Evolv Express, the Company's "flagship product," in relevant part:

Our flagship product is **Evolv Express®**, a touchless security screening system designed ***to detect firearms, improvised explosive devices, and tactical knives*** as visitors walk through at a normal pace, individually or in groups, with no need to form into a single- file line.

57.    On July 23, 2021, Defendant George made an appearance on Fox Business, in a video entitled "Evolv Technologies uses AI powered security to detect weapons" that was posted on Fox Business's website. In the interview, Defendant George stated the following:

We have the signatures for all the weapons in the world [. . .] we've written the machine learning algorithms ***for all the guns, all the bombs, and all the large tactical knives*** in the world and our sensor system can identify those signatures quickly, send an alert, and will stop it before it gets into the venue.

58.    On March 23, 2022, Evolv published a blog post titled "NCS4 and Evolv Express" (the "March 2022 Blog Post") which provided the following description of the NCS4 Report, in relevant part:

Key Findings:

***The operational exercise incorporated forty-one functional areas, with Express earning an overall composite score of 2.84***. This score reflects that, on average, Express met the criteria established for this exercise. In fact, overall, Express performed very well. Scores in the categories evaluated during the exercise are presented below. It's important to note that, as a practice, Evolv does not publicly share any details that could compromise our customer's security process. Therefore, specific details such as actual weapon makes and models, images, etc. are not included here, but we do share this sensitive information with our customers privately in a responsible manner.

| Evaluation Category | Score |
|---|---|
| Detection of standardized test pieces defined in applicable standards | 3.0 |
| Detection of ferrous weapons including NILECJ test pieces, actual handguns, handgun components, knives, and pipe materials that could be used for constructing IEDs (cumulative score) | 2.7 |
| Detection of threat objects in small bags (cumulative score) | 3.0 |
| Visual indicators | 3.0 |
| Audible indicators | 2.3 |
| Detection of multiple threats on one person | 3.0 |
| Detection of multiple threats on multiple people | 3.0 |
| Exceeding dual-lane throughput claims of 3600 people per hour | 3.0 |
| Screening patrons at multiple walking speeds (cumulative score) | 2.8 |
| Flow control tablet performance (cumulative score) | 2.8 |
| Remote access capabilities (cumulative score) | 2.9 |
| Dashboard and insight analytic capabilities (cumulative score) | 2.8 |
| User interface indicators (cumulative score) | 3.0 |

Scores marked as cumulative indicate the average of individual scores within the exercise category.

\*        \*        \*

The fact is, technology, environmental conditions, architectural structures, conops, and staff training are all important factors that affect screening effectiveness. It's possible to eliminate many or all of the problematic factors in a controlled environment. ***It's not possible to do that in a real-world environment, and that's why I'm so proud of these Express results from NCS⁴.***

Authentic Evaluators:

Although NCS⁴ is part of the University of Southern Mississippi, their approach is anything but academic. NCS⁴ recruits third party evaluators who are seasoned security professionals and have been personally accountable for security screening. NCS⁴ selects new evaluators for each operational exercise, so they have a fresh perspective and are looking at each solution in the context of the venue where it is being tested.

In the case of the Express exercise, the evaluators were a retired U.S. Secret Service Special Agent in Charge, a Security Representative for an organization that produces live events, and a Security Representative for professional baseball, soccer, and hockey. Evolv didn't get to pick these evaluators.

I truly believe that the Express evaluators are solid proxies for the typical Express buyer. They had the same questions and "show me" attitude that we love to see in our customers. I learned a lot from them and appreciated their suggestions for ways

we can both improve our product and better train our customers to get the best possible results. We're always learning and working to improve.

*    *    *

Summary:

We at Evolv Technology feel confident that these NCS⁴ results ***provide third party validation*** of what hundreds of customers and over 200 million visitors already know from their personal experience: ***that Express offers an unmatched combination of high- performance weapons detection, low false alarm rates, high throughput, unique operational insight, and an awesome visitor experience***.

I am really looking forward to working with our customers to sort through what the NCS⁴ evaluation findings could mean for their facilities. I also can't wait to see how our future products perform in the NCS⁴ process. ***Having a trusted, fully independent third party available to stress test our product in real-world environment is an incredibly valuable asset***. It will push us to always be doing more to make people safe, and that's something I can always get excited about.

59.    On March 28, 2022, the Company filed with the SEC its annual report on Form 10-K for the year ending December 31, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants George, Charlton, Ramos, Cohen, Ellenbogen, Glat, Orfao, Saintil, Kedzierski, Sheehy, Sullivan, and Zuberi. Appended to the 2021 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants George and Ramos attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

60.    The 2021 10-K contained the following statement touting the efficacy of the Company's security screening technology:

Evolv Technologies Holdings, Inc. [. . .] ***is a global leader in Artificial Intelligence ("AI") -based weapons detection for security screening***. Our mission is to make the world a safer and more enjoyable place to work, learn, and play. We are democratizing security by making it seamless for facility operators to address the chronic epidemic of escalating gun violence, mass shootings and terrorist attacks in a cost-effective manner while improving the visitor experience.

Unlike traditional walk-through metal detectors, our touchless security screening solutions use AI software, software as a service ("SaaS") cloud services and

20

advanced sensors to **reliably detect dangerous weapons while significantly reducing nuisance alarms from harmless personal items**. This means that visitors can walk through our solution without stopping, without removing items from their pockets or bags, and without having to form a single file line. Our products significantly reduce the number of false positive alarms, allowing security staff to focus their attention on high probability threats.

61.    The 2021 10-K contained the following statement about Evolv Express:

Our flagship product is **Evolv Express**, a touchless security screening **system designed to quickly detect firearms, improvised explosive devices, and tactical knives in unstructured people flows**. Evolv Express currently supports a maximum screening throughput of 3,600 people per hour. Evolv Express became commercially available in October 2019.

62.    The 2021 10-K contained the following additional statement regarding the

Company's security screening technology:

**We are a global leader in AI-based weapons detection for security screening**. Unlike conventional walk-through metal detectors, our products use advanced sensors, artificial intelligence software, and cloud services **to reliably detect guns, improvised explosives, and large knives** while ignoring harmless items like phones and keys. This not only enhances security at venues and facilities but also improves the visitor experience by making screening up to ten times faster than alternatives at up to 70% lower total cost.

63.    The 2021 10-K contained the following risk disclosure:

**If our products fail or are perceived to fail to detect and prevent attacks or if our products fail to identify and respond to new and increasingly complex and unpredictable methods of attacks, our business and reputation may suffer**. There is no guarantee that our products will detect and prevent all attacks, especially in light of the rapidly changing security landscape to which it must respond, as well as unique factors that may be present in our customers' operating environments. Additionally, our products may falsely detect items that do not actually represent threats. These false positives may impair the perceived reliability of our products, and may therefore adversely impact market acceptance of our products, and could result in negative publicity, loss of customers and sales and increased costs to remedy any problem.

Our products, which are complex, may also contain undetected errors or defects when first introduced or as new versions are released. We have experienced these errors or defects in the past in connection with new products and product upgrades. We expect that these errors or defects will be found from time to time in the future in new or enhanced products after commercial release. Defects may result in increased vulnerability to attacks, cause our products to fail to detect security

21

threats, or temporarily interrupt our products' ability to screen visitors in a customer's location. Any errors, defects, disruptions in service or other performance problems with our products may damage our customers' business and could harm our reputation. If our products fail to detect security threats for any reason, it may incur significant costs, the attention of our key personnel could be diverted, our customers may delay or withhold payment to us or elect not to renew or cause other significant customer relations problems to arise.

***We may also be subject to liability claims for damages related to errors or defects in our products. For example, if our products fail to detect weapons or explosive devices that are subsequently used by terrorists, criminals or unbalanced individuals to cause casualties at a high profile, public venue, our reputation could be significantly harmed***. A material liability claim or other occurrence that harms our reputation or decreases market acceptance of our products may harm our business and operating results. Although we have limitation of liability provisions in our terms and conditions of sale, they may not fully or effectively protect us from claims as a result of federal, state, or local laws or ordinances, or unfavorable judicial decisions in the United States or other countries. The sale and support of our products also entails the risk of product liability claims. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation, divert or distract management's time and other resources, and harm our business and reputation.

64.     On March 24, 2023, the Company filed with the SEC its annual report on Form 10-K for the year ending December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants George, Charlton, Donohue, Cohen, Ellenbogen, Glat, Saintil, Kedzierski, Sheehy, Sullivan, and Zuberi. Appended to the 2022 10-K were certifications pursuant to SOX signed by Defendants George and Donohue attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

65.     The 2022 10-K contained the following statement touting the efficacy of the Company's security screening technology:

***("AI")-based weapons detection for security screening***. Our mission is to make the world a safer and more enjoyable place to live, work, learn, and play. We are democratizing security by making it seamless for facility operators to address the

chronic epidemic of escalating gun violence, mass shootings and terrorist attacks in a cost-effective manner while improving the visitor experience.

Unlike traditional walk-through metal detectors, our touchless security screening solutions use AI software, software-as-a-service ("SaaS") cloud services, and advanced sensors to *reliably detect weapons that could be a threat to a crowd of visitors while significantly reducing nuisance alarms from harmless personal items*. This means that visitors can walk through our solution without stopping, without removing personal items from their pockets or bags, and without having to form a single file line. Our products significantly reduce the number of false positive alarms, allowing security staff to focus their attention on high probability threats.

66.     The 2022 10-K contained the following statement about Evolv Express:

Our flagship product is Evolv Express, a touchless security screening system *designed to quickly detect firearms, improvised explosive devices, and large tactical knives in unstructured people flows*. Evolv Express currently supports a maximum screening throughput of 4,000 people per hour.

67.     The 2022 10-K contained the following additional statement regarding the

Company's security screening technology:

*We are a global leader in AI-based weapons detection for security screening*. Unlike conventional walk-through metal detectors, our products use advanced sensors, artificial intelligence software, and cloud services *to reliably detect guns, improvised explosives, and large knives while ignoring harmless items like phones and keys*. This not only enhances security at venues and facilities but also improves the visitor experience by making screening up to ten times faster than alternatives at up to 70% lower total cost.

68.     The 2022 10-K contained the following risk disclosure:

*If our products fail or are perceived to fail to detect and prevent attacks or if our products fail to identify and respond to new and increasingly complex and unpredictable methods of attacks, our business and reputation may suffer*. There is no guarantee that our products will detect and prevent all attacks, especially in light of the rapidly changing security landscape to which it must respond, as well as unique factors that may be present in our customers' operating environments. Additionally, our products may falsely detect items that do not actually represent threats. These false positives may impair the perceived reliability of our products, and may therefore adversely impact market acceptance of our products, and could result in negative publicity, loss of customers and sales and increased costs to remedy any problem.

Our products, which are complex, may also contain undetected errors or defects when first introduced or as new versions are released. We have experienced these errors or defects in the past in connection with new products and product upgrades. We expect that these errors or defects will be found from time to time in the future in new or enhanced products after commercial release. Defects may result in increased vulnerability to attacks, cause our products to fail to detect security threats, or temporarily interrupt our products' ability to screen visitors in a customer's location. Any errors, defects, disruptions in service or other performance problems with our products may damage our customers' business and could harm our reputation. If our products fail to detect security threats for any reason, including failures due to customer personnel or security processes, it may result in significant costs, the attention of our key personnel could be diverted, our customers may delay or withhold payment to us or elect not to renew or cause other significant customer relations problems to arise.

***We may also be subject to liability claims for damages related to errors or defects in our products. For example, if our products fail to detect weapons or explosive devices that are subsequently used by terrorists, criminals or unbalanced individuals to cause casualties at a high profile, public venue, we could incur financial damages and our reputation could also be significantly harmed***. A material liability claim or other occurrence that harms our reputation or decreases market acceptance of our products may harm our business and operating results. Although we have limitation of liability provisions in our terms and conditions of sale, they may not fully or effectively protect us from claims as a result of federal, state, or local laws or ordinances, or unfavorable judicial decisions in the United States or other countries. The sale and support of our products also entails the risk of product liability claims. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation, divert or distract management's time and other resources, and harm our business and reputation.

69.    On February 20, 2024, the Company posted a press release on its website (the "February 2024 Press Release"). The February 2024 Press Release contained the following statement:

Fact: Evolv undergoes rigorous internal *and* external testing and validation procedures that are implemented before, during, and after the procurement process. All of these third-party tests, conducted by third-party experts, concluded that the Evolv Express solution was highly effective at detecting firearms and many other types of weapons.

Examples of Third-Party Testing (since 2022):

* * *

- NPSA, the National Protective Security Authority (UK), formerly known as the CPNI.

70.    On February 29, 2024, the Company filed with the SEC its annual report on Form 10-K for the year ending December 31, 2023 (the "2023 10-K"). The 2023 10-K was signed by Defendants George, Charlton, Donohue, Gonzales, Ellenbogen, Glat, Naik, Saintil, Sheehy, Sullivan, and Zuberi. Appended to the 2023 10-K were certifications pursuant to SOX signed by Defendants George and Donohue attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

71.    The 2023 10-K contained the following statement touting the efficacy of the Company's security screening technology:

> Evolv Technologies Holdings, Inc. [. . .] *is a leader in Artificial Intelligence ("AI")- based weapons detection for security screening*. Our mission is to make the world a safer and more enjoyable place to live, work, learn, and play. We are democratizing security by making it seamless for facility operators to address the chronic epidemic of escalating gun violence, mass shootings and terrorist attacks in a cost-effective manner while improving the visitor experience.
>
> Unlike traditional walk-through metal detectors, our touchless security screening solutions use AI software, software-as-a-service ("SaaS") cloud services, and advanced sensors to *reliably detect weapons that could be a threat to a crowd of visitors while significantly reducing nuisance alarms from harmless personal items*. This means that most visitors can walk through our solution without stopping, without removing personal items from their pockets or bags, and without having to form a single file line. Our products significantly reduce the number of false positive alarms, allowing security staff to focus their attention on high probability threats.

72.    The 2023 10-K contained the following statement about Evolv Express:

> Our flagship product is Evolv Express, a touchless security screening system designed to *quickly detect firearms, improvised explosive devices, and large tactical knives in unstructured people flows*. Evolv Express currently supports a maximum screening throughput of approximately 4,000 people per hour.

25

73.     The 2023 10-K contained the following additional statement regarding the

Company's security screening technology:

> *We are a leader in AI-based weapons detection for security screening*. Unlike
> conventional walk-through metal detectors, our products use advanced sensors,
> artificial intelligence software, and cloud services to *reliably detect guns,*
> *improvised explosives, and large knives while ignoring harmless items like*
> *phones and keys*. This not only enhances security at venues and facilities but also
> improves the visitor experience by making screening up to ten times faster than
> alternatives at up to 70% lower total cost.

74.     The 2023 10-K contained the following risk disclosure:

> *If our products fail or are perceived to fail to detect and prevent attacks or if our*
> *products fail to identify and respond to new and increasingly complex and*
> *unpredictable methods of attacks, our business and reputation may suffer*. There
> is no guarantee that our products will detect and prevent all attacks, especially in
> light of the rapidly changing security landscape to which it must respond, as well
> as unique factors that may be present in our customers' operating environments.
> Additionally, our products may falsely detect items that do not actually represent
> threats. These false positives may impair the perceived reliability of our products
> and may therefore adversely impact market acceptance of our products, which
> could, in turn, result in negative publicity, loss of customers and sales, and increased
> costs to remedy any problem.
>
> Our products, which are complex, may also contain undetected errors or defects
> when first introduced or as new versions are released. We have experienced these
> errors or defects in the past in connection with new products and product upgrades.
> We expect that these errors or defects will be found from time to time in the future
> in new or enhanced products after commercial release. Defects may result in
> increased vulnerability to attacks, cause our products to fail to detect security
> threats, or temporarily interrupt our products' ability to screen visitors in a
> customer's location. Any errors, defects, disruptions in service or other
> performance problems with our products may damage our customers' business and
> could harm our reputation. If our products fail to detect security threats for any
> reason, including failures due to customer personnel or security processes, it may
> result in significant costs, the attention of our key personnel could be diverted, our
> customers may delay or withhold payment to us or elect not to renew or cause other
> significant customer relations problems to arise.
>
> *We may also be subject to liability claims for damages related to errors or defects*
> *in our products. For example, if our products fail to detect weapons or explosive*
> *devices that are subsequently used by terrorists, criminals, or unbalanced*
> *individuals to cause casualties at a high profile, public venue, we could incur*
> *financial damages and our reputation could also be significantly harmed*. A
> material liability claim or other occurrence that harms our reputation or decreases

market acceptance of our products may harm our business and operating results. Although we have limitation of liability provisions in our terms and conditions of sale, they may not fully or effectively protect us from claims as a result of federal, state, or local laws or ordinances, or unfavorable judicial decisions in the United States or other countries. The sale and support of our products also entails the risk of product liability claims. We maintain insurance to protect against certain claims associated with the use of our products, but our insurance coverage may not adequately cover any claim asserted against us. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation, divert or distract management's time and other resources, and harm our business and reputation.

75.     The statements contained in ¶¶ 55-74 were materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to the Company's business, operations and prospects. Specifically, the Individual Defendants caused the Company to make false and misleading statements and fail to disclose that: (1) Evolv had materially overstated the efficacy of its products; (2) the lack of effectiveness of Evolv's products with regard to detecting knives and guns led to an increased risk of undetected weapons entering locations such as schools; and (3) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**B.  The Truth Regarding the Company's Security Screening Technology Emerges**

76.     On November 2, 2022, IPVM, which describes itself as the "world's leading authority on physical security technology", released the IPVM Report.

77.     The IPVM Report stated that "A BBC special report based on 1,000+ pages of documents obtained by IPVM ***has exposed security screening manufacturer Evolv for deceptive marketing and colluding with NCS4, a public entity, to hide test results*** showing failures at weapons screening."

78.     The IPVM Report then stated the following regarding NCS4:

The National Center for Spectator Sports Safety and Security (NCS⁴), part of the University of Southern Mississippi, offers an "operational exercise" program "for the purposes of demonstrating advertised capabilities, industry best practices, and operational capacity to address gaps in sports safety and security." These occur at real public events, with experts invited to act as "independent evaluators."

Results are then published in "a white paper that will be distributed to venue managers and operators for the purposes of education and as an aid in the procurement decision- making process."

*        *        *

While NCS⁴'s public report on Evolv Express ***shows a seemingly-strong score of 2.84/3.00, the hidden private version (that IPVM obtained) tells a much different story including several failures that conflict with Evolv's public marketing***. NCS⁴'s heavily- redacted public report withheld detailed test results, evaluator comments, and other information, only providing overall averages that are favorable to Evolv.

Evolv publicized the report as "validation" from a "fully independent third party," but emails show Evolv forced NCS⁴ to redact the public report, and that Evolv executives heavily influenced the design of testing criteria and directly edited the report in numerous rounds of drafts, even asking for certain results to be removed.

79.    The IPVM Report contained an image of an email between Richard "Rick" Abraham ("Abraham"), the Company's Vice President of Technical Sales and Solutions and NCS4, in which Abraham stated that the NCS4 report would "need further review within Evolv," demonstrating, contrary to Evolv's representations, that NCS4 was not independent.

80. The IPVM Report also contained the following image, demonstrating the extent of the Abraham's edits to NCS4 Report:



81. The IPVM Report further revealed that Evolv's technology is inadequate when it comes to detecting small, micro-compact pistols, as compared to a conventional metal detector:

> The full, unredacted NCS⁴ white paper **_reveals that Evolv failed to meet testing criteria for detection of micro-compact pistols, with only a 92% detection rate_**, whereas a conventional metal detector would alert on this pistol virtually 100% of the time. Such firearms are increasingly popular according to industry data, representing 25% of 9mm handgun sales.

82. The IPVM Report contained the following image from the unredacted NCS4 paper, showing Evolv Express's deficiencies with regard to detecting small handguns:

| 1.4 | Micro-compact Pistol (Bodyguard 380) | **Requirement:** Evolv Express will detect a micro-compact at a rate of 98% or greater. **Outcome:** Evolv Express had a detection rate of 92% in 25 walk-throughs. **Evaluator Feedback:** The system had a 100% detection rate prior to adding additional rigors during the exercise. The issue identified can be mitigated through proper awareness and training for security staff assigned to screening. | 2.5 |

83.    The IPVM Report then stated that "[t]he evaluator noted without further explanation that '[t]he system had a 100% detection rate prior to adding additional rigors,' indicating the actual detection rate with 'additional rigors' was lower than 92%." Further, the IPVM Report stated that "[a]ll *the results for micro-compact pistols were deleted from the public report*."

84.    Regarding knives, the IPVM Report stated the following, and included the following images from the confidential, internal report, documenting Evolv Express's poor capabilities with regard to detecting knives:

> Evolv struggled with knives the most, prompting concern from evaluators. Again, these results and comments were deleted from the public report.
>
> Testing revealed that "the [Evolv Express] system was incapable of detecting every knife," despite conducting tests at one of the highest sensitivity settings for the device. With a score of 1.3 out of 3.0 for this category, Evolv detected some knives at a rate of 0% with a 53% rate overall.
>
> *    *    *
>
> ***Results were so poor that evaluators said they "Recommend full-transparency to potential customers based on data collected."*** In a separate section of the report dedicated to evaluator feedback, multiple evaluators called knife detection "not consistent" and "unreliable".
>
> While the requirements for knife testing in the final version only mention blades longer than 5", test images show knives with varying blades including some that seem shorter than 5".

85.    Further, the IPVM Report stated that "[i]n earlier drafts, specifications for knife testing read "knives with blades that ranged from under four inches to greater than six inches." After testing, this was changed to simply read "knives", as shown below[.]" It then showed the following image from two different NCS4 Report drafts, attesting to this observation:

**Knife Testing Wording Changes** — IPVM

**NCS4 Report Draft (01/18)**

3.3.3. Test Objects

Clean test subjects processed through the system at walking pace of 1.0 – 1.5 m/s, followed by test objects. Test objects were steel (UNS G41400) simulated handguns following the dimension criteria outlined in NILECJ-STD-0601.00 and NIJ Standard-0601.02 (Figure 19), firearms, knives with blades that ranged from under four inches to greater than six inches, and innocuous items (e.g., wrist watches and cell phones). The steel simulated handguns were positioned on clean test subjects and processed through the Evolv Express a total of 225 times while evenly distributed among the nine test locations identified in NIJ 0601.02. Figure 20 illustrates the nine test locations (right) and the steel simulated handgun (left).

**NCS4 Report Draft (01/24)**

3.3.3. Test Objects

Clean test subjects processed through the system at walking pace of 1.0 – 1.5 m/s, followed by test objects. Test objects were steel (UNS G41400) simulated handguns following the dimension criteria outlined in NILECJ-STD-0601.00 and NIJ Standard-0601.02, firearms, firearm components, knives, and innocuous items (e.g., wrist watches and cell phones). The steel simulated handguns were positioned on clean test subjects and processed through the Evolv Express a total of 225 times while evenly distributed among the nine test locations identified in NIJ 0601.02. Figure 12 illustrates the nine test locations (right) and the steel simulated handgun (left).

86.     The IPVM Report then stated, "[t]he wording of this requirement raises questions, as it differs from past NCS⁴ language. While NCS⁴ requirements for object detection are typically quantitative (e.g. the system will detect X at a rate of Y% or greater) the language for Evolv has no quantitative requirement[.]"

87.     Also on November 2, 2022, the BBC published the November 2022 BBC Article, which revealed documents shared with the BBC by IPVM. The November 2022 BBC Article stated the following, in relevant part:

Some of the world's biggest venues, including Manchester Arena, are using weapons scanners "incapable" of detecting some large knives."

Evolv, a US-based company that sells artificial-intelligence (AI) scanners, claims they can detect all weapons.

But documents shared with BBC News by research firm IPVM suggest they may fail to detect certain types of knives, as well as some bombs and components.

\*        \*        \*

AI and machine learning enable the scanners to create unique "signatures" of weapons that differentiate them from items such as computers or keys, Evolv says, reducing manual checks and preventing long queues.

"Metallic composition, shape, fragmentation – we have tens of thousands of these signatures, for all the weapons that are out there," chief executive Peter George said last year, "all the guns, all the bombs and all the large tactical knives."

88.    The November 2022 BBC Article then noted that doubts had been raised about claims such as those made by Defendant George, such as the one contained in ¶ 87:

For several years, independent security experts have expressed doubts about some of Evolv's claims.

The company has previously refused to let IPVM test its technology, Evolv Express.

But last year, it gave permission to the National Center for Spectator Sports Safety and Security (NCS4).

NCS4's public report, published earlier this year, gave Evolv a score of 2.84 out of three – many types of guns were detected 100% of the time.

But is also produced a private report, obtained via a Freedom of Information request by IPVM and shared with BBC News along with emails between Evolv and NCS4.

***And it gave Evolv's ability to detect large knives a score of just 1.3 out of 3.***

***In 24 walkthroughs Evolv Express failed to detect large knives 42% of the time.***

"The system was incapable of detecting every knife on the sensitivity level observed during the exercise," the report says. "Recommend full transparency to potential customers, based on data collected."

IPVM's Conor Healy said: "For certain categories of knives, the system didn't detect them at all when they were brought through. And that completely conflicts with what Evolv has told the public."

89.    The November 2022 BBC Article further revealed that NCS4's report had been manipulated by Evolv employees and contained the following image showing that Evolv employees had made tracked changes to the report to delete certain sections, consistent with emails obtained by IPVM:



Emails obtained by IPVM show Evolv employees had been allowed to make "tracked changes" to the report - deleting certain sections.

~~**Outcome:** Multiple knives of different types/kinds were processed through at randomized test locations. Some knives alerted at 100%, while others were not detected. The overall detection rate was 58% in 24 walk-throughs.¶~~
~~**Evaluator Feedback:** The technology can detect some knives of various sizes, shapes, and thicknesses at various test locations, but the system was incapable of detecting every knife on the sensitivity level observed during the exercise.~~

A section on the detection of large knives deleted by an Evolv employee using "track changes"

90.    The November 2022 BBC Article then stated that "[i]n one version [of the report], dated 19 January, the conclusion '***knives were not consistently detected***' was deleted." Further, the November 2022 BBC Article stated that "***[a]n Evolv employee using 'track changes' also deleted a reference to the system being 'incapable of detecting every knife' and one to the 1.3 score***."

91.    On the news of the BBC Article and the IPVM Report, the price of Evolv stock fell by $0.08, or 2.73% to close at $2.85 on November 2, 2022. The next day, it fell a further $0.16, or 5.6%, to close at $2.69.

92.     Then, on May 23, 2023, BBC News published the May 2023 BBC Article, which stated that "[a] security firm that sells AI weapons scanners to schools *is facing fresh questions about its technology after a student was attacked with a knife that the $3.7 [million] system failed to detect*."

93.     The May 2023 BBC Article stated that the victim of this attack was "walking in the corridor of his school in Utica, New York, when another student walked up behind him and stabbed him with a knife." The victim's lawyer told the BBC that he suffered "*multiple stab wounds to the head, neck, face, shoulder, back and hand*."

94.     The May 2023 BBC Article stated that "[t]he *knife used in the attack was brought into Proctor High School despite a multimillion [dollar] weapons detection system installed by a company called Evolv Technology*."

95.     The May 2023 BBC Article stated the following:

On 31 October, CCTV captured the perpetrator of the attack against Ehni Ler Htoo entering Proctor High School *and passing through the Evolv weapons scanners, according to one source at the school who has seen the security footage*.

"When we viewed the horrific video, we all asked the same question. How did the student get the knife into the school?" said Brian Nolan, Superintendent of Utica Schools.

The Knife used in the stabbing was more than 9 [inches, 22.8cm] long.

*         *         *

"Through investigation it was determined the Evolv Weapon Detection system… was not designed to detect knives," [Mr.] Nolan said.

*The scanners were removed from Proctor High School and replaced by 10 metal detectors*. But the scanners are still operating in the district's remaining 12 schools. [Mr.] Nolan says the district cannot afford to get rid of Evolv's system in its remaining schools.

Since that attack, [Mr.] Nolan says three other knives have been found on students in other schools in the district where the Evolv systems continue to operate.

*One of the knives was 7 [inches] long. Another was a curved blade with finger holes*. Another was a pocket knife. [Mr.] Nolan says *they were all found because they were reported to staff – not because the weapons scanner had detected them*.

"The kids [who had the knives] all said they walked right through the weapons detection system, we asked them about that... it truly, truly does not find knives," he said.

\*       \*       \*

Evolv claims its system uses cutting-edge AI technology to find weapons. However, its critics say not enough is known about how the system works - or how effective this technology is at finding different types of weapons.

The BBC sent a detailed right of reply to Evolv, laying out what had happened at the school in Utica, and the decision of the school to stop using its system.

*We also asked what Evolv had told schools about what its system could and could not detect, whether it had told schools that independent testing had found its systems could not reliably detect large knives*, and whether it thought its systems were suitable for use in schools. *Evolv did not answer the questions*.

Conor Healy of IPVM, a firm that analyses security equipment, *says Evolv has exaggerated how effective the system is.*

"*There's an epidemic of schools buying new technology based on audacious marketing claims, then finding out it has hidden flaws, often millions of dollars later. Evolv is one of the worst offenders*. School officials are not technical experts on weapons detection, and companies like Evolv profit from their ignorance."

Playing fast and loose with marketing claims is unacceptable when you sell a security product used to protect young people, he added.

96.     On this news, the price of Evolv stock fell by $0.45, or 7.56%, to close at $5.50 on May 23, 2023.

97.     On October 12, 2023, Evolv filed with the SEC a Current Report on Form 8-K. In this current report, the Company announced the following:

On October 12, 2023, *the Company announced that the U.S. Federal Trade Commission had requested information about certain aspects of its marketing practices and we are pleased to answer their questions*, as well as educate them

about our mission to make communities safer and more secure. Like many companies, when Evolv receives inquiries from regulators, our approach is to be cooperative and educate them about our company. The Company stands behind its technology's capabilities and performance track record, and is proud to partner with hundreds of security professionals to add a layer of advanced technology to their safety plan.

98.    On this news, the price of Evolv stock fell $0.58 per share, or 13.33%, to close at $3.77 on October 12, 2023.

99.    On October 25, 2023, IPVM released an article entitled "Why We Believe Evolv Express Is Not Actually Intelligent" (the "October 2023 IPVM Article"). The October 2023 IPVM Article stated, in part, the following:

While Evolv prominently markets "AI" (Artificial Intelligence), *we do not believe Evolv Express is actually intelligent because it struggles to differentiate small knives from cell phones and guns from laptops, capabilities that we believe are basic to being an "intelligent" weapons detector*.

\*    \*    \*

Evolv routinely disparages its "metal detector" competitors, *but Evolv's newest setting, released to deal with the problem of false alarms detecting knives as cell phones, shows how it has deceived the public and competes unfairly against rivals, causing public schools to spend far more on its systems than rivals*.

Fundamental Problems

\*    \*    \*

Evolv was able to hide this problem until multiple stabbings at Evolv sites and IPVM disclosed NCS4 test results. *Afterward, Evolv released new higher sensitivity modes (similar to metal detectors) that reduced missing knives but increased false alarms on phones*.

This creates *an unintelligent combination where Evolv's sensitivity slider on lower* settings correctly alarms on guns but falsely on many laptops, plus missing smaller knives, while at higher settings, it starts falsely alarming on many cell phones[.]

\*    \*    \*

Whatever "AI" Evolv claims, the real-world practical result is that it is not actually intelligent, just like its far lower-cost competitors who have and admit these same issues.

Evolv has fought, for years, to hide these very fundamental facts, claiming that publicizing such information, rather than the fundamental flaws of the product Evolv sells, would harm the public.

Evolv Assured Opposite

Evolv assured the public and its investors for years that it could solve these fundamental problems of metal detectors.

\*       \*       \*

Tuning Tradeoff, Not Actual Intelligence

Evolv's "abilities" fundamentally rely on simplistic sensitivity tuning (their slider from A to now G) rather than actual intelligence. **This is something IPVM was able to recreate by buying, testing, and tuning Evolv's conventional competitors**.

100.    On this news, the price of Evolv stock fell $0.06, or 1.48%, to close at $3.99 on October 25, 2023.

101.    Then, on February 20, 2024, before the market opened, Evolv filed with the SEC a current report on Form 8-K, attached to which was a press release titled "Evolv Technology Provides Regulatory Update" that stated, in relevant part:

[O]n Friday, February 16, 2024 the SEC notified **the Company it was initiating an investigation that was described as a confidential "non-public, fact finding inquiry."** The Company notes the SEC's explicit guidance that the investigation "should neither be construed as an indication by the Commission or its staff that any violation of law has occurred, nor as a reflection upon any person, entity, or security." The Company is eager to cooperate with the SEC as it is with any regulatory body.

102.    On this news, the price of Evolv stock fell by $0.82 per share, or 15.67%, to close at $4.41 on February 20, 2024.

103.    Then, on March 13, 2024, BBC published the March 2024 BBC Article, which stated the following:

Evolv Technology makes "intelligent" scanners designed to replace metal detectors by identifying people with concealed guns, knives and bombs.

But the company has come under mounting criticism for overstating what the technology can deliver.

Evolv told BBC News it had altered its claims about UK testing to "better reflect the process taken".

The Securities Exchange Commission (SEC) *launched an investigation into the company last month. And in October the company revealed the Federal Trade Commission (FTC) was looking into its marketing practices*.

\*     \*     \*

The company had said that its AI weapons scanner had been tested by the UK Government's National Protective Security Authority (NPSA)[.]

On 20 February the company put out a press release, including a claim that the NPSA was one of a number of testers who had "concluded that the Evolv Express solution was highly effective at detecting firearms and many other types of weapons".

But *BBC News can reveal the NPSA does not do this type of testing*.

When BBC News put this to Evolv, the company said: "After discussion with NPSA, we updated the language used in the February 20 press *release to better reflect the process taken*."

Instead, it said: an independent company had "tested and validated" Evolv's technology, using NPSA standards.

But the UK company that did this testing, Metrix NDT, told BBC News it was "not correct to say we 'validated' the system".

\*     \*     \*

Metrix NDT managing director Nick Fox told BBC News that Evolv's system had indeed been tested against NPSA specifications.

But when asked if Metrix NDT had found it "highly effective at detecting firearms and many other types of weapons", he said: "It is not within our remit to pass any value judgements on the results."

Evolv told the BBC that in addition to those results, Evolv makes available to any serious prospective customer full third-party testing reports for detection performance.

Prof Marion Oswald, who was on the government's Centre of Data Ethics and Innovation advisory board until last year, told BBC News it was worrying the technology was replacing "tried and tested" security options.

"It does highlight the need for really close scrutiny and potential additional regulation of companies making these types of claims," she told BBC News.

And she worried how customers might be influenced, "especially if claims are being made about how certain government bodies may have been involved".

Evolv has previously said its technology detects the "signatures" of concealed weapons.

104.    On this news, the price of Evolv stock fell by $0.13 per share, or 3.51%, to close at $3.57 on March 13, 2024.

## C. The Individual Defendants Caused Evolv to Issue Misleading Financial Reporting

105.    On August 18, 2022, Evolv filed a quarterly report on Form 10-Q with the SEC (the "Q2 2022 10-Q"). Appended to the Q2 2022 10-Q were SOX Certifications signed by Defendants George and Donohue, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

106.    The Q2 2022 10-Q provided the Company's total revenue, as well as its revenue from Product, Subscription, and Service, for the period ended June 30, 2022 as follows:

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Revenue: | | | | |
| Product revenue | $ 4,146 | $ 2,617 | $ 9,340 | $ 4,884 |
| Subscription revenue | 4,006 | 1,521 | 7,010 | 2,748 |
| Service revenue | 918 | 540 | 1,430 | 739 |
| Total revenue | 9,070 | 4,678 | 17,780 | 8,371 |

107.    Regarding the Company's "Product Revenue," the Q2 2022 10-Q stated that Evolv "derive[s] a portion of our revenue from the sale of our Express and Edge equipment and related add-on accessories to customers. ***Revenue is recognized when control of the product has transferred to the customer, which follows the terms of each contract***."

108.    In a section titled "Revenue Recognition," the Q2 2022 10-Q provided the following explanation of the Company's approach to recognizing revenue:

> The Company recognizes revenue in accordance with Accounting Standards Codification 606 – *Revenue from Contracts with Customers* ("ASC 606"). Under ASC 606, revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. ***In order to achieve this core principle, the Company applies the following five steps when recording revenue: (1) identify the contract, or contracts, with the customer, (2) identify the performance obligations in the contract, (3) determine the transaction price, (4) allocate the transaction price to the performance obligations in the contract and (5) recognize revenue when, or as, performance obligations are satisfied***.

109.    On November 9, 2022, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q3 2022 10-Q"). Appended to the Q3 2022 10-Q were SOX Certifications signed by Defendants George and Donohue, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

110.    The Q3 2022 10-Q provided the Company's total revenue, as well as its revenue from Product, Subscription, and Service, for the period ended September 30, 2022 as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2022 | 2021 | 2022 | 2021 |
| Revenue: | | | | |
| Product revenue | $ 9,839 | $ 5,395 | $ 19,179 | $ 10,279 |
| Subscription revenue | 5,198 | 2,312 | 12,208 | 5,060 |
| Service revenue | 1,493 | 717 | 2,923 | 1,456 |
| Total revenue | 16,530 | 8,424 | 34,310 | 16,795 |

111.    The same day, the Company hosted an earnings call to discuss its financial results for the third quarter of 2022. During the earnings call, Defendant George stated that the Company was "***encouraged by our performance, which was highlighted by record growth in revenues, ARR and RPO*** as well as our strong market penetration[.]" Defendant George went on to state that "***Revenue in the third quarter was $16.5 million, up 96% year-over-year and 82% sequentially***,"

which reflected "*continuing momentum with our channel partners*."

112.    On March 1, 2023, the Company hosted an earnings call to discuss its financial results for the fourth quarter of 2022. During the earnings call, Defendant George stated that the Company's results were "highlighted by record growth in new customers, revenues, ARR and RPO." Defendant George went on to state that "*revenue in the fourth quarter was $20.9 million, up 217% year-over-year and 26% sequentially.*" And that "*[f]or the year, revenue was $55.2 million, up 136% year-over-year.*"

113.    On March 24, 2023, the Company filed the 2023 10-K, which provided the Company's total revenue, as well as its revenue from Product, Subscription, and Service, for the fiscal year ended December 31, 2022—showing increases well over 100% as compared to the prior year—as follows:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2022 | 2021 | $ Change | % Change |
| Revenue: | | | | |
| Product revenue | $        31,985 | $        13,631 | $        18,354 | 135  % |
| Subscription revenue | 17,569 | 7,803 | 9,766 | 125 |
| Service revenue | 5,641 | 1,959 | 3,682 | 188 |
|      Total revenue | 55,195 | 23,393 | 31,802 | 136 |

114.    On May 10, 2023, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q1 2023 10-Q"). Appended to the Q1 2023 10-Q were SOX Certifications signed by Defendants George and Donohue, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

115.    The Q1 2023 10-Q provided the Company's total revenue, as well as its revenue from Product, Subscription, and Service, for the period ended March 31, 2023 as follows:

| | | Three Months Ended March 31, | |
| --- | --- | --- | --- |
| | | 2023 | 2022 |
| Revenue: | | | |
| Product revenue | $ | 8,754 | $ | 5,194 |
| Subscription revenue | | 6,466 | 3,004 |
| Service revenue | | 3,361 | 512 |
| Total revenue | | 18,581 | 8,710 |

116.    That same day, the Company hosted an earnings call to discuss its financial results for the first quarter of 2023. During the earnings call, Defendant George stated that "***Revenue in the first quarter was $18.6 million, up 113% year-over-year***."

117.    During the earnings call, Defendant Donohue stated that "Annual Recurring Revenue, or ARR, at March 31, 2023, was $42 million, reflecting growth of 153% year-over-year and 23% sequentially."

118.    On November 9, 2023, the Company filed an amended quarterly report on Form 10-Q/A with the SEC (the "Q2 2023 10-Q/A"). Appended to the Q2 2023 10-Q/A Q were SOX Certifications signed by Defendants George and Donohue, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

119.    The  Q2 2023 10-Q/A provided the Company's total revenue, as well as its revenue from Product, Subscription, and Service, for the period ended June 30, 2023 as follows:

| | | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- | --- |
| | | 2023 | 2022 | 2023 | 2022 |
| Revenue: | | | | | |
| Product revenue | $ | 7,243 | $ 4,146 | $ 15,997 | $ 9,340 |
| Subscription revenue | | 7,964 | 4,006 | 14,430 | 7,010 |
| Service revenue | | 4,618 | 918 | 7,979 | 1,430 |
| Total revenue * | | 19,825 | 9,070 | 38,406 | 17,780 |

120.    Also on November 9, 2023, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q3 2023 10-Q"). Appended to the Q3 2023 10-Q were SOX Certifications signed by Defendants George and Donohue, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and

the disclosure of all fraud.

121.    The Q3 2023 10-Q provided the Company's total revenue, as well as its revenue from Product, Subscription, Service, and License fee and other, for the period ended September 30, 2023 as follows:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| Revenue: | | | | |
| Product revenue | $ 3,191 | $ 9,839 | $ 19,188 | $ 19,179 |
| Subscription revenue | 10,231 | 5,198 | 24,661 | 12,208 |
| Service revenue | 4,757 | 1,493 | 12,736 | 2,923 |
| License fee and other revenue | 2,012 | — | 2,012 | — |
| Total revenue * | 20,191 | 16,530 | 58,597 | 34,310 |

122.    That same day, the Company hosted an earnings call to discuss its financial results for the third quarter of 2023. During the earnings call, Defendant George stated that "[d]uring the third quarter, we delivered strong results across every key measure of the business, including revenue, ARR, RPO, subscriptions and gross margin." He went on to state that "***Revenue in the third quarter was a record $20.2 million with reoccurring revenue of $14.3 million, up 131% year-over-year***."

123.    During the same earnings call, Defendant Donohue stated that "Annual recurring revenue or ARR at September 30, 2023 was $65.8 million, reflecting growth of 129% year-over-year and 21% sequentially" and that "Total recurring revenue during the third quarter of 2023 was $14.4 million compared to $6.2 million in the third quarter of 2022 reflecting growth of 131% year-over- year."

124.    On February 29, 2024, the Company filed the 2024 10-K. The 2024 10-K provided the Company's total revenue, as well as its revenue from Product, Subscription, Service, and

License fee and other, for the fiscal year ended December 31, 2023—showing significant increases as compared to the prior year—as follows:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2023 | 2022 | $ Change | % Change |
| Revenue: | | | | |
| Product revenue | $ 21,977 | $ 31,985 | $ (10,008) | (31) % |
| Subscription revenue | 37,247 | 17,569 | 19,678 | 112 |
| Service revenue | 16,141 | 4,331 | 11,810 | 273 |
| License fee and other revenue | 5,053 | 1,310 | 3,743 | 286 |
| Total revenue | 80,418 | 55,195 | 25,223 | 46 |

125.    That same day, the Company hosted an earnings call to discuss its financial results for the 2023 fiscal year. . During the earnings call, Defendant George stated that the Company was "delighted to be reporting revenue of $80.4 million in 2023, up 46% year over year."

126.    During the same earnings call, Defendant Donohue stated that the Company was "particularly delighted with the strong growth in our recurring revenues, which represented 65% of our full year revenues and reached 80% of our fourth quarter revenues." He went on to state that "Annual recurring revenue or ARR at December 31, 2023, was $75 million, reflecting growth of 120% year over year and 14% sequentially."

127.    On May 9, 2024, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q1 2024 10-Q"). Appended to the Q1 2024 10-Q were SOX Certifications signed by Defendants George and Donohue, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

128.    The Q1 2024 10-Q provided the Company's total revenue, as well as its revenue from Product, Subscription, Service, and License fee and other, for the period ended March 31, 2024 as follows:

|  |  | Three Months Ended March 31, | |
|  |  | 2024 | 2023 |
| Revenue: |  |  |  |
| Product revenue | $ | 603 | $ 8,754 |
| Subscription revenue |  | 14,503 | 6,466 |
| Service revenue |  | 5,384 | 2,786 |
| License fee and other revenue |  | 1,178 | 575 |
| Total revenue * |  | 21,668 | 18,581 |

129. That same day, the Company hosted an earnings call to discuss its financial results for the first quarter of 2024. During the earnings call, Defendant George stated that "Revenue in the first quarter was $21.7 million, up 17% year over year," which reflected "***continued traction with our channel partners***."

130. During the same earnings call, Defendant Donohue stated that "Annual recurring revenue or ARR at March 31, 2024, was $83 million, reflecting growth of 96% year over year" and that "total recurring revenue during the first quarter of 2024 was $19.4 million compared to $9.1 million in the first quarter of 2023, reflecting growth of 114% year over year."

131. On August 8, 2024, the Company filed a quarterly report on Form 10-Q with the SEC (the "Q2 2024 10-Q"). Appended to the Q2 2024 10-Q were SOX Certifications signed by Defendants George and Donohue, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

132. The Q2 2024 10-Q provided the Company's total revenue, as well as its revenue from Product, Subscription, Service, and License fee and other, for the period ended June 30, 2024 as follows:

|  |  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|  |  | 2024 | 2023 | 2024 | 2023 |
| Revenue: |  |  |  |  |  |
| Product revenue | $ | 2,044 | $ 7,243 | $ 2,647 | $ 15,997 |
| Subscription revenue |  | 15,903 | 7,964 | 30,406 | 14,430 |
| Service revenue |  | 5,553 | 3,905 | 10,937 | 6,691 |
| License fee and other revenue |  | 2,040 | 713 | 3,218 | 1,288 |
| Total revenue * |  | 25,540 | 19,825 | 47,208 | 38,406 |

133.    The Q2 2024 10-Q stated that "***growing momentum with our channel partners***" was a "***key trend***" contributing to driving increased adoption of Evolv's solutions and growth in its sales.

134.    The statements contained in ¶¶106-133 were materially false and misleading as the Company's financial statements prepared for the periods between the second quarter of 2022 through the second quarter of 2024 contained material misstatements. Specifically, the Individual Defendants caused the Company to fail to disclose that: (1) Evolv's sales were subject to extra-contractual terms and conditions not shared with the Company's accounting personnel; (2) as a result, during the Relevant Period, the Company's reported revenue and related metrics were distorted; and (3) despite touting "growing momentum" and "continued traction" with channel partners, the Company's personnel was engaged in misconduct concerning sales to one of the Company's largest channel partners.

### D. The Truth Regarding Evolv's Financial Statements is Revealed

135.    On October 25, 2024, the Company issued a press release (the "October 2024 Press Release") announcing that "shareholders and others should not rely upon certain of the Company's previously issued financial statements" and that Evolv will delay filing its quarterly report on Form 10-Q for the period ended September 30, 2024, due to material misstatements impacting revenue recognition and other previously reported metrics that are a function of revenue.

136.    The October 2024 Press Release further announced that, pursuant to an ongoing internal investigation, Evolv has determined that "certain sales, including sales to one of its largest channel partners, were subject to extra-contractual terms and conditions, some of which were not shared with the Company's accounting personnel, and that certain Company personnel engaged in misconduct in connection with those transactions."

137.    The October 2024 Press Release also revealed that "the accounting for certain sales transactions was inaccurate and that, among other things, revenue was prematurely or incorrectly recognized in connection with financial statements prepared for the periods between the second quarter of 2022 and the second quarter of 2024."

138.    The October 2024 Press Release continued to state that the committee conducting the investigation "has determined that these misstatements are material for certain financial statements prepared for these periods and that the recognition of revenue in the proper periods will impact each of those financial statements" and also determined that "[o]ther previously reported metrics that are a function of revenue were also misstated as a result of these revenue misstatements."

139.    On this news, Evolv's stock price declined almost 40%, falling from $4.10 per share on October 24, 2024, to $2.47 per share on October 25, 2024, on unusually high trading volume.

140.    Then, on October 31, 2024, the Company issued a press release announcing that it had terminated Defendant George, the Company's CEO, effective immediately, and that Defendant Ellenbogen would serve as the Company's Interim President and CEO until a successor to Defendant George is appointed.

141.    On this news, Evolv's stock price declined from $2.34 per share on October 30, 2024, to $2.15 per share on October 31, 2024, about 8%, on unusually high trading volume.

**E.    The Individual Defendants Cause the Company to Issue False and Misleading Proxy Statements During the Relevant Period**

142.    On April 13, 2022, the Company filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants George, Ellenbogen, Glat, Charlton, Sheehy,

Sullivan, Saintil, Cohen, Orfao, Kedzierski, and Zuberi solicited, reviewed, approved, and caused the Company to file the 2022 Proxy Statement.

143.    The 2022 Proxy Statement asked the Company's shareholders to approve, *inter alia*: (1) the re-election Defendants Charlton, Orfao, and Zuberi to the Board; and (2) the ratification of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2022 fiscal year.

144.    With regard to the Board's role in risk oversight, the 2022 Proxy Statement stated as follows, in relevant part:

> Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight. The Board of Directors regularly reviews information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. Our Audit Committee is responsible for discussing the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled. Our Audit Committee is also responsible for overseeing our major financial and cybersecurity risk exposures and the steps our management has taken to monitor and control these exposures. manages the risk associated with the independence of the Board of Directors and potential conflicts of interest and oversees the Company's efforts with regard to environmental, social and governance matters and associated risks . Our Compensation Committee oversees the management of risk relating to the Company's incentive compensation and equity-based plans and arrangements. Our Technology Sub-Committee monitors the risks relating to proposed transactions involving target candidates and our technology portfolio.

145.    Despite the above-referenced statements, the Board failed to adequately carry out its risk management obligations by making and/or cauing the Company to make the false and misleading statements and omissions alleged herein.

146.    Defendants George, Ellenbogen, Glat, Charlton, Sheehy, Sullivan, Saintil, Cohen, Orfao, Kedzierski, and Zuberi caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Evolv had materially overstated the efficacy of its products;

and (2) the lack of effectiveness of Evolv's products with regard to detecting knives and guns led to an increased risk of undetected weapons entering locations such as schools.

147.    On April 13, 2023, the Company filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants George, Ellenbogen, Glat, Charlton, Sheehy, Sullivan, Saintil, Cohen, Orfao, Kedzierski, and Zuberi solicited, reviewed, approved, and caused the Company to file the 2023 Proxy Statement.

148.    The 2023 Proxy Statement asked the Company's shareholders to approve, *inter alia*: (1) the re-election Defendants Cohen, Glat, Saintil, and Sullivan to the Board; and (2) the ratification of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2023 fiscal year.

149.    With regard to the Board's role in risk oversight, the 2023 Proxy Statement stated as follows, in relevant part:

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the Board of Directors at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks. The Board reviews material risks facing the Company with the Audit Committee, senior management, and outside advisors on a regular basis. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight. The Board of Directors regularly reviews information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. Our Audit Committee is responsible for discussing the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled. Our Audit Committee is also responsible for overseeing our major financial and cybersecurity risk exposures and

the steps our management has taken to monitor and control these exposures. manages the risk associated with the independence of the Board of Directors and potential conflicts of interest and oversees the Company's efforts with regard to environmental, social and governance matters and associated risks . Our Compensation Committee oversees the management of risk relating to the Company's incentive compensation and equity-based plans and arrangements. Our Technology Sub-Committee monitors the risks relating to proposed transactions involving target candidates and our technology portfolio. Our Investment Committee oversees financial risk management, including cash management, liquidity, and investment strategy.

150.    Despite the above-referenced statements, the Board failed to adequately carry out its risk management obligations by making and/or causing the Company to make the false and misleading statements and omissions alleged herein.

151.    Defendants George, Ellenbogen, Glat, Charlton, Sheehy, Sullivan, Saintil, Cohen, Orfao, Kedzierski, and Zuberi caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Evolv had materially overstated the efficacy of its products; (2) the lack of effectiveness of Evolv's products with regard to detecting knives and guns led to an increased risk of undetected weapons entering locations such as schools; (3) Evolv's sales were subject to extra-contractual terms and conditions not shared with the Company's accounting personnel; (4) as a result, during the Relevant Period, the Company's reported revenue and related metrics were distorted; and (4) despite touting "growing momentum" and "continued traction" with channel partners, the Company's personnel was engaged in misconduct concerning sales to one of the Company's largest channel partners.

152.    One April 15, 2024, the Company filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy Statement"). Defendants George, Ellenbogen, Glat, Charlton, Gonzales, Naik, Sheehy, Sullivan, Saintil, and Zuberi solicited, reviewed, approved, and caused the Company to file the 2024 Proxy Statement.

153.    The 2024 Proxy Statement asked the Company's shareholders to approve, *inter*

*alia*: (1) the re-election Defendants Ellenbogen, George, and Naik to the Board; (2) the ratification of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 fiscal year; (3) an amendment to the Company's Certificate of Incorporation to provide for exculpation of officers from breaches of fiduciary duty to the fullest extent permitted by the General Corporation Law of the State of Delaware; (4) on an advisory basis, the compensation of the Company's named executive officers; and (5) the annual frequency of future Say-on-Pay Votes.

154.    With regard to the Board's role in risk oversight, the 2024 Proxy Statement stated as follows, in relevant part:

> Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the Board of Directors at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks. The Board reviews material risks facing the Company with the Audit Committee, senior management, and outside advisors on a regular basis. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight. The Board of Directors regularly reviews information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. Our Audit Committee is responsible for discussing the Company's policies with respect to risk assessment and risk management, including guidelines and policies to govern the process by which the Company's exposure to risk is handled. Our Audit Committee is also responsible for overseeing our major financial and cybersecurity risk exposures and the steps our management has taken to monitor and control these exposures. manages the risk associated with the independence of the Board of Directors and potential conflicts of interest and oversees the Company's efforts with regard to environmental, social and governance matters and associated risks. Our Compensation Committee oversees the management of risk relating to the Company's incentive compensation and equity-based plans and arrangements. Our

Technology Committee monitors the risks relating to proposed transactions involving target candidates and our technology portfolio. Our Investment Committee oversees financial risk management, including cash management, liquidity, and investment strategy.

155.    Despite the above-referenced statements, the Board failed to adequately carry out its risk management obligations by making and/or causing the Company to make the false and misleading statements and omissions alleged herein.

156.    Defendants George, Ellenbogen, Glat, Charlton, Gonzales, Naik, Sheehy, Sullivan, Saintil, and Zuberi caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Evolv had materially overstated the efficacy of its products; (2) the lack of effectiveness of Evolv's products with regard to detecting knives and guns led to an increased risk of undetected weapons entering locations such as schools; (3) Evolv's sales were subject to extra-contractual terms and conditions not shared with the Company's accounting personnel; (4) as a result, during the Relevant Period, the Company's reported revenue and related metrics were distorted; and (4) despite touting "growing momentum" and "continued traction" with channel partners, the Company's personnel was engaged in misconduct concerning sales to one of the Company's largest channel partners.

## DAMAGES TO EVOLV

157.    As a direct and proximate result of the Individual Defendants' misconduct, Evolv has expended and will continue to expend significant sums of money.

158.    Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class Actions.

159.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts

associated with the Company's violations.

160.    As a direct and proximate result of the Individual Defendants' conduct, Evolv has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

<b><u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u></b>

161.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

162.    Evolv is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

163.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

164.    Plaintiff is an owner of Evolv stock and has been a continuous holder of the Company's common shares at all relevant times.

165.    A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Board consisted of the following nine individuals: Defendants Glat, Charlton, Ellenbogen, Gonzales, Naik, Saintil, Sheehy, Sullivan, and Zuberi (the "Director Defendants"). Plaintiff is required to show that five directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, none of the Board's current directors are capable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face

a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

166.    Each of the Director Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

167.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

168.    The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

169.    Demand upon Defendant Glat is futile for the following additional reasons. Defendant Glat has served as a Company director since July 2021 and as Chairman of the Board since November 2023. The Company provides Defendant Glat with significant compensation as detailed above. Defendant Glat signed the 2021, 2022, and 2023 Forms 10-K, and solicited the

2022, 2023, and 2024 Proxy Statements, all of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Glat breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

170.    Demand upon Defendant Charlton is futile for the following additional reasons. Defendant Charlton has served as a Company director since July 2021. The Company provides Defendant Charlton with significant compensation as detailed above. Defendant Charlton signed the 2021, 2022, and 2023 Forms 10-K, and solicited the 2022, 2023, and 2024 Proxy Statements, all of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. Defendant Charlton is a defendant in the First Securities Class Action and thus faces potential liability.  For these reasons, Defendant Charlton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

171.    Demand upon Defendant Ellenbogen is futile for the following additional reasons. Defendant Ellenbogen has served as a Company director and as the Company's Chief Innovation Officer since July 2021. On October 30, 2024, Defendant Ellenbogen was appointed as the Company's Interim President and CEO. Defendant Ellenbogen signed the 2021, 2022, and 2023 Forms 10-K, and solicited 2022, 2023, and 2024 Proxy Statements, all of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of

the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Ellenbogen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

172.    Demand upon Defendant Gonzales is futile for the following additional reasons. Defendant Gonzales has served as a Company director since November 2023. The Company provides Defendant Gonzales with significant compensation as detailed above. Defendant Gonzales signed the 2023 10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gonzales breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

173.    Demand upon Defendant Naik is futile for the following additional reasons. Defendant Naik has served as a Company director since November 2023. Defendant Naik signed the 2023 10-K and solicited the 2024 Proxy Statement, both of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Naik breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

174.    Demand upon Defendant Saintil is futile for the following additional reasons. Defendant Saintil has served as a Company director since July 2021. The Company provides

Defendant Saintil with significant compensation as detailed above. Defendant Saintil signed the 2021, 2022, and 2023 Forms 10-K, and solicited the 2022, 2023, and 2024 Proxy Statements, all of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Saintil breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

175.    Demand upon Defendant Sheehy is futile for the following additional reasons. Defendant Sheehy has served as a Company director since July 2021. The Company provides Defendant Sheehy with significant compensation as detailed above. Defendant Sheehy signed the 2021, 2022, and 2023 Forms 10-K and solicited the 2022, 2023, and 2024 Proxy Statements, all of which contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Sheehy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon her is futile and, therefore, excused.

176.    Demand upon Defendant Sullivan is futile for the following additional reasons. Defendant Sullivan has served as a Company director since July 2021. The Company provides Defendant Sullivan with significant compensation as detailed above. Defendant Sullivan signed the 2021, 2022, and 2023 Forms 10-K, and solicited the 2022, 2023, and 2024 Proxy Statements, all of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons,

Defendant Sullivan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

177.    Demand upon Defendant Zuberi is futile for the following additional reasons. Defendant Zuberi has served as a Company director since July 2021. The Company provides Defendant Zuberi with significant compensation as detailed above. Defendant Zuberi signed the 2021, 2022, and 2023 Forms 10-K, and solicited the 2022, 2023, and 2024 Proxy Statements, all of which contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement to make false and misleading statements and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Zuberi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested and, thus, demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand upon the Board is futile follow.

179.    Defendants Sheehy, Glat, Saintil, and Gonzales either serve, or served during the Relevant Period, as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices as alleged above. Therefore, Sheehy, Glat, Saintil, and Gonzales cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

180.    Additionally, each of the Director Defendants received payments, benefits, stock

options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Director Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Director Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Evolv stock and stock options they held.

181. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Business Conduct and Ethics, which goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to Evolv's standards of business conduct. The Individual Defendants violated the Code of Business Conduct and Ethics because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Business Conduct and Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

182. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

183. The Director Defendants may be protected against personal liability for their acts

of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Evolv. If there is a liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Evolv, there would be no insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

184.    If there is no liability insurance, then the Director Defendants will not cause Evolv to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

185.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## <u>COUNT ONE</u>

### Against the Proxy Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    The Proxy Defendants solicited the 2022, 2023, and 2024 Proxy Statements containing materially false and misleading statements and/or omissions.

188.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

189.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a- 9.

190.     Under the direction and watch of the Director Defendants, the 2022, 2023, and 2024 Proxy Statements failed to disclose that: (1) the Individual Defendants made and/or caused the Company to make the false and misleading statements and omissions alleged herein; and (2) the Board failed to adequately carry out its risk management and oversight obligations as described in the 2022, 2023, and 2024 Proxy Statements and failed to adhere to the Code of Business Conduct and Ethics.

191.     The 2022 Proxy Statement also failed to disclose that: (1) Evolv had materially overstated the efficacy of its products; and (2) the lack of effectiveness of Evolv's products with regard to detecting knives and guns led to an increased risk of undetected weapons entering locations such as schools.

192.     The 2023 and 2024 Proxy Statements failed to disclose that: (1) Evolv had

materially overstated the efficacy of its products; (2) the lack of effectiveness of Evolv's products with regard to detecting knives and guns led to an increased risk of undetected weapons entering locations such as schools; (3) Evolv's sales were subject to extra-contractual terms and conditions not shared with the Company's accounting personnel; (4) as a result, during the Relevant Period, the Company's reported revenue and related metrics were distorted; and (4) despite touting "growing momentum" and "continued traction" with channel partners, the Company's personnel was engaged in misconduct concerning sales to one of the Company's largest channel partners.

193.    In exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022, 2023, and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2022, 2023, and 2024 Proxy Statements.

194.    As a result of the Proxy Defendants causing the 2022, 2023, and 2024 Proxy Statements to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (i) the re-election of Defendants Charlton, Orfao, Zuberi, Cohen, Glat, Saintil, Sullivan, Ellenbogen, George, and Naik to the Board of Directors; (ii) the ratification of PricewaterhouseCoopers LLP as the Company's independent registered accounting firm; and (iii) the compensation of the Company's named executive officers.

195.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2022 and 2023 Proxy Statements.

196.    Plaintiff, on behalf of Evolv, has no adequate remedy at law.

## COUNT TWO

### Against the Individual Defendants for Breach of Fiduciary Duties

197.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Evolv's business and affairs.

199.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

200.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Evolv.

201.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

202.    In further breach of their fiduciary duties owed to Evolv, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) Evolv had materially overstated the efficacy of its products; (2) the lack of effectiveness of Evolv's products with regard to detecting knives and guns led to an increased risk of undetected weapons entering locations such as schools; (3) Evolv's sales were subject to extra-contractual terms and conditions not shared with the Company's accounting personnel; (4) as a result, during the Relevant Period, the Company's reported revenue and related metrics were distorted; and (5) despite touting "growing momentum" and "continued traction" with channel partners, the Company's personnel was

engaged in misconduct concerning sales to one of the Company's largest channel partners.

203.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

204.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

205.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

206.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Evolv has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

208.    Plaintiff on behalf of Evolv has no adequate remedy at law.

## COUNT THREE

### Against the Individual Defendants for Unjust Enrichment

209.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

210.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Evolv.

211.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Evolv that was tied to the performance or artificially inflated valuation of Evolv or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

212.    Plaintiff, as a shareholder and a representative of Evolv, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

213.    Plaintiff on behalf of Evolv has no adequate remedy at law.

## COUNT FOUR

### Against the Individual Defendants for Waste of Corporate Assets

214.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

215.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

216.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; and (2) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Actions, addressing the Individual Defendants' unlawful action.

217.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

218.    Plaintiff, on behalf of Evolv, has no adequate remedy at law.

## COUNT FIVE

### Against the Individual Defendants for Abuse of Control

219.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

220.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Evolv, for which they are legally responsible.

221.    As a direct and proximate result of the Individual Defendants' abuse of control, Evolv has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

222.    Plaintiff on behalf of Evolv has no adequate remedy at law.

## COUNT SIX

### Against the Individual Defendants for Gross Mismanagement

223.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

224.    By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Evolv in a manner consistent with the operations of a publicly held corporation.

225.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Evolv has sustained and will continue to sustain significant damages.

226.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

227.    Plaintiff, on behalf of Evolv, has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Evolv and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.     Directing Evolv to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Evolv and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions;

D.     Awarding punitive damages;

E.     Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: November 12, 2024               **THE ROSEN LAW FIRM, P.A.**

*/s/ Joshua Baker*
Joshua Baker, Esq. (BBO #695561)
Phillip Kim, Esq. (*pro hac vice* forthcoming)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
 Email: jbaker@rosenlegal.com
          philkim@rosenlegal.com

*Counsel for Plaintiff*

VERIFICATION

I, Bonnie Maas am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Signed by:

*Bonnie Maas*    11/11/2024

Bonnie Maas